## STATEMENT OF FACTS

1.      Your affiant is currently participating in an investigation which targets heroin traffickers operating in the District of Columbia and Maryland. The investigation began in March 2013 and is being investigated in conjunction with Task Force Members.  Three of the main targets of this investigation (Joseph Borges, Charles Greer and Darnell Jackson) have already been arrested and indicted in Cr. No. 14-71 (RJL), as described herein.  RICH was arrested on April 15, 2014, at his residence in Largo, Maryland.

2.      In March 2013, the FBI and MPD began an investigation into a person known to law enforcement as Darnell Jackson who was reportedly distributing heroin in five separate neighborhoods in Southeast and Northwest, Washington, D.C.   Wiretap interceptions on Jackson's phone led to the identity of Charles Greer as Jackson's heroin supplier.  Further wiretap interceptions on Greer's phone led to the identity of Joseph Borges as Greer's heroin supplier. Other people, including Corey RICH, have been identified as Greer's heroin customers. This investigation thus far has utilized search warrants, wire interceptions on the JACKSON target cellular telephone and the GREER target cellular telephone and the GREER target home telephone, interceptions of oral communications occurring in and within the vicinity of GREER's vehicle, a confidential informant (CW-1), an undercover police officer (UCO-1), controlled narcotic purchases, GPS data from both the GREER target cellular telephone and the JACKSON target telephone, and various means of surveillance, including the use of pole cameras and other investigative techniques.  Thus, through the investigation, law enforcement officers were able to identify a large scale heroin distribution operation (including the street level distribution of heroin by Jackson and RICH) which is managed and operated by Greer, who in turn is supplied by Borges, which is operating both in the District of Columbia and the District of Maryland.

3.     At the beginning of this investigation, from May to September 2013, law enforcement made a series of controlled narcotics purchases from Jackson and, in each purchase, approximately ten to forty grams of suspected heroin was purchased using an undercover officer. Thereafter, authorization to intercept wire communications on various telephones and the GREER vehicle was given by the Honorable Rudolph Contreras, of the District Court for the District of Columbia; in Misc. 13-1133 (RC), regarding xxx-xxx-xxxx, (the GREER target cellular telephone); in Misc. 13-1280 (RC), regarding xxx-xxx-xxxx, (the GREER target home telephone) and in Misc. 13-987 (RC), regarding xxx-xxx-xxxx, (the Jackson target telephone) and the Honorable Roger Titus, of the District of Maryland; in 14-MC-63, regarding the vehicle operated by GREER.   Law enforcement also placed a pole camera focusing on a car lot (hereinafter "car lot") on Bowen Street, S.E., Washington, D.C. as this was a location where Greer often met Borges, Jackson and RICH.

4.     The following are examples of interceptions from the JACKSON and the GREER cellular telephones and instances of surveillance which support your affiant's belief that RICH, Jackson, Greer and Borges were working together to acquire large amounts of heroin for re-distribution and that RICH was supplied by GREER with heroin for further distribution.

5.     In activation #907, on October 30, 2013, at 6:16 p.m., COREY RICH called GREER from telephone number xxx-xxx-xxxx.  RICH asked GREER where he wanted to meet him.  GREER told RICH, "I'm up at the lot, so you can bring that to me." RICH told GREER, "Alright, I'll be past there.  As soon as I…I'm gonna be thirty minutes, tops forty minutes, be right there."   Agents conducted surveillance using the aforementioned pole camera and observed the following:  RICH arrived in a green Toyota Camry and parked next to the GREER target vehicle.  The camera then went out of frame until 7:14 p.m.  RICH's Camry remained parked

next to GREER's vehicle.  About twenty seven minutes later RICH was seen to exit GREER's vehicle, and get back into the Camry and both men drove away.   Based on the call in activation #962, your affiant believes RICH met with GREER to pay GREER money RICH owed him for narcotics that GREER supplied to him.

6.     In activation # 962, on October 31, 2013, at 11:06 a.m., GREER called RICH at telephone number xxx-xxx-xxxx.  GREER said, "That money that you gave me last night…I just left out, they run me out the motherfucking store said the money was fake."  RICH told GREER, "Well hold it, I'll be to you in a minute."  GREER responded, "Yeah, I'll be up at the lot man." Agents conducted surveillance using the pole camera and observed the following: at 12:15 p.m. the same green Toyota Camry observed the previous day entered the car lot.  RICH got into the GREER target vehicle and the two appeared to talk for about fifteen minutes.  RICH exited GREER's vehicle, returned to the Camry and drove off.   Your affiant believes that at this meeting, the men met to discuss the money which RICH paid to GREER for narcotics which turned out to be counterfeit.

7.     In activation #1128, on November 1, 2013, at 2:57 p.m., GREER called COREY RICH and told him to "get ready to dump," and that he would call RICH later this evening. Your affiant believes that GREER was advising RICH that he (GREER) was about to be resuppled with heroin and would soon be resupplying RICH.

8.     In activation #1221, on November 2, 2013, at 1:40 p.m., GREER called RICH at telephone number xxx-xxx-xxxx.   GREER asked RICH, "What's up…you couldn't get it together or something?"  RICH asked "Where you at?"  GREER responded "I'm at the lot." RICH told GREER he would be there in four minutes.  Agents conducted surveillance using the pole camera and observed the following: RICH arrived in the same green Toyota Camry seen

3

previously.  RICH got into the GREER target vehicle and the two appeared to talk for about twelve minutes.  RICH exited GREER's vehicle and both men drove away.  Your affiant believes the purpose of this face to face meeting inside the target vehicle was to discuss narcotic trafficking.

9.   In activation #2675, on November 26, 2013, at 2:58 p.m., GREER called RICH at xxx-xxx-xxxx.  GREER told RICH, "I will be at the pool room in twenty minutes."  Later in activation #2686, at 5:02 p.m., GREER called RICH at telephone number xxx-xxx-xxxx. GREER asked, "What did you find something else to do?"  RICH told GREER he was just finishing with his wheel and asked if GREER had left yet.  GREER responded, "Nah, I'm sitting in my car." In activation #2691, at 6:11 p.m., RICH called GREER from telephone number xxx-xxx-xxxx.  RICH asked, "You in your car?"  GREER responded "Nah, I'm in the pool room, you outside?"  RICH responded, "Yeah I'm outside."  Your affiant believes that in this call, GREER met with RICH to discuss narcotic trafficking.

10.   In activation #4853, on December 16, 2013, at 7:08 p.m., GREER called RICH at telephone number xxx-xxx-xxxx.  GREER told RICH, "I'm up on the lot by myself."  RICH said, "I'm gonna catch you before you go in."   GREER said, "I might want you to do that because I might want you to take a look at, after you dump, I might want you to take a look at something." Your affiant believes GREER wanted RICH to test a new batch of heroin he was going to get from BORGES that evening.

11.   In activation #4856, on December 16, 2013, at 7:16 p.m., GREER called BORGES at telephone number xxx-xxx-xxxx.  GREER asked, "You ain't at the hamburger place, is you?"  BORGES said, "No, I'm by the lot."  GREER said, "Ok, I'm sitting right here." Agents conducted surveillance using the pole camera and observed the following: at

4

approximately 7:05 p.m., the GREER target vehicle arrived at the lot.  BORGES arrived fifteen minutes later and parked his Toyota Corolla on Southern Avenue.  BORGES walked to GREER's vehicle and got into the front passenger seat.  Approximately ten minutes later, BORGES exited the vehicle, returned to his Corolla and drove off.  Your affiant believes that at this meeting, BORGES provided GREER with heroin.  (Part of your affiant's belief is informed by the telephone calls with RICH and JACKSON which occurred the following day wherein they reported back to GREER on the perceived quality of the heroin from their customers or testers).

12.     In activation #4859, on December 16, 2013, at 7:28 p.m., GREER called COREY RICH at telephone number xxx-xxx-xxxx.  GREER, your affiant knows from the pole camera, was sitting in his vehicle with BORGES at the time he placed the call to this customer.  As this telephone call to RICH was heard to begin ringing, a background conversation was captured.  GREER was overheard to say to BORGES, "I remember when I first got some you was telling me about the smell."  Your affiant knows when heroin is more undiluted it has a strong vinegar smell.  RICH then answered the phone and GREER asked where he was.  He responded, "Where do you want me to be?"  GREER told him, "Come to the lot."  RICH told GREER he would be there in ten minutes.  Agents who were conducting surveillance using the pole camera then observed the following: shortly after BORGES departed GREER's vehicle, at approximately 7:35 p.m., a black GMC Yukon arrived at the car lot and the driver got into GREER's vehicle.  Approximately ten minutes later, the driver exited GREER's vehicle and returned to the GMC Yukon.  The GMC Yukon and GREER then drove off.  (The driver could not be seen clearly but COREY RICH is believed to have been the person in the GMC Yukon.)  Your affiant believes that GREER received heroin from BORGES and was able to pass it off to the customer in the

privacy of his vehicle.  (Part of your affiant's belief is informed by the telephone calls with RICH which occurred the following day.)

13.     In activation #4918, on December 17, 2013, at 10:27 a.m., RICH called GREER from telephone number xxx-xxx-xxxx.  RICH explained, "I need like two more but it's cool, I don't know.  I have to wait for the other dude to see what's up.  But yeah, everybody from last night said the other guy was straight power, way better than that one."  Your affiant believes RICH was telling GREER that RICH's heroin customers or testers were satisfied with the heroin GREER provided to RICH.

14.     In activation #4928, on December 17, 2013, at 11:50 a.m., GREER called RICH. GREER asked RICH, "What you say, that's a bad situation?"  RICH responded, "It ain't, it ain't…she wasn't like our first one…the first one would knock her out, she's a step behind that one."  GREER responded, "But it can be worked?"  RICH said, "Yeah, it's cool but she's a step behind the first one."   GREER said, "Alright, get that dump shit together, I got something I got to do."  RICH said, "Alright we'll talk."  GREER responded, "I don't want to talk, I want to dump!"  RICH responded, "Ok, I'm gonna get my son and my daughter away from me. I got you."  Your affiant believes RICH was telling GREER that while this new batch of heroin was not as potent as earlier batches, they could still add a cutting agent to it and sell it.   When GREER said he wanted to dump, he meant he was able to supply RICH with heroin.

15.     In activation #4939, on December 17, 2013, at 1:29 p.m., GREER received an incoming call from BORGES. GREER told BORGES, "You know, they say the other one was the best. . . but I will know more in a little bit."  Your affiant believes GREER was telling BORGES that RICH's customers or heroin testers were satisfied with the potency of the heroin GREER received from BORGES and which GREER provided to RICH.

6

16.    In activation #4970, on December 17, 2013, at 5:00 p.m., JACKSON called GREER from the Jackson target telephone and said "My man says it's real strong. . . I am going to back up and get about five more motherfuckers you know and I'll call you back."   In activation #4976 at 5:51 p.m., GREER called JACKSON.  JACKSON said, "They ain't give no reading yet, it's still draining real good."  GREER replied, "So we ain't got no problems, so I can go ahead."  JACKSON replied, "Yeah."   Your affiant believes JACKSON told GREER that JACKSON's heroin customers or testers were satisfied with the heroin GREER provided to JACKSON and GREER told JACKSON that as a result, GREER was going to obtain a large amount from his supplier.

17.    In activation #4978, on December 17, 2013, at 5:53 p.m., GREER called BORGES.  GREER told BORGES, "I am hearing all good news."  Your affiant believes GREER told BORGES that the heroin BORGES had supplied to GREER was a good quality and GREER's customers were satisfied.

18.    In activation #4983, on December 17, 2013, at 6:28 p.m., GREER received an incoming call from JACKSON placed on the Jackson target telephone.  JACKSON told GREER, "All ten people, you know, some went this way and some went that way, 9, 10."  GREER asked, "When you say both ways, you mean what?"   JACKSON replied, "Main line and." GREER interrupted and said, "Oh yeah and both read good?  JACKSON said, "Yeah."  GREER said, "That is all I need to know."   In this call, your affiant believes JACKSON told GREER that ten of his customers, whether they main lined by injecting the heroin into their body or snorted it, all gave the heroin a quality test score of 9 or 10, the highest rating.  Your affiant believes that this call further demonstrates the BORGES supplied GREER with such significant amounts of heroin that the opinions of ten people were necessary to test the quality of the product.

19.    <u>In activation #5081, on December 18, 2013, at 1:43 p.m.</u>, GREER called BORGES.  BORGES told GREER it was "all good news" and that they were "singing the praises."  GREER then asked BORGES where he was going to be.  BORGES said he was near the "hamburger place" and asked which one would GREER hit first, "the lot or the hamburger place."  After GREER said, "the lot," BORGES agreed to meet him there.  Your affiant believes that the purpose of the meeting was to discuss their narcotic trafficking activity and for BORGES to resupply GREER.

20.    During the month of February and into March, wire interceptions revealed that due to the inclement weather, BORGES did not receive the shipments of heroin he was expecting.  However, once the weather improved, BORGES resumed supplying GREER with heroin.

21.    <u>In activation #10588, on March 21, 2014, at 2:29 p.m.</u>, JOSEPH BORGES called GREER from telephone number xxx-xxx-xxxx.  BORGES told GREER, probably "tomorrow or Sunday for sure," but that he did not know what time, or whether it would be late the next day GREER said he did not care what time it happened.  Your affiant believes in this call, BORGES told GREER he was about to be resupplied with heroin.

22.    <u>In activation #10624, on March 21, 2014, at 7:23 p.m.</u> GREER called Darnell JACKSON at telephone number xxx-xxx-xxxx. JACKSON asked what was going on, and GREER responded that he would probably call JACKSON on tomorrow's date, or no later than Sunday, but that JACKSON "can start smiling now."  JACKSON it did not matter what time GREER called.   Your affiant believes in this call, GREER told JACKSON he was about to be resupplied with heroin.

23. <u>In activation #10714, on March 22, 2014, at 2:52 p.m.</u>, COREY RICH called GREER from telephone number xxx-xxx-xxxx. GREER told RICH that he was "just getting ready to dump." RICH said he heard him. GREER asked if RICH heard him, and said he was "getting ready to rumble." GREER then said he did not know if he would get a chance to see RICH that day, but if he did not, it would be tomorrow. Your affiant believes in this call, GREER told RICH he was about to be resupplied with heroin and would be able to re-supply RICH.

24. <u>In activation #11022, on March 25, 2014, at 12:11 p.m.</u>, JOSEPH BORGES called GREER from telephone number xxx-xxx-xxxx, and said that because GREER was home, they should go get "a bite to eat real quick." GREER asked where, and BORGES said, "the hamburger joint." They agreed to meet in 15 to 20 minutes. Your affiant believes in this call, BORGES and GREER made arrangements to meet so that GREER could be resupplied with heroin.

25. <u>In activation #11030, on March 25, 2014, at 12:51 p.m.</u>, JOSEPH BORGES called GREER from telephone number xxx-xxx-xxxx. GREER said he was there (at the Wendy's Restaurant where both had been surveilled meeting previously) and BORGES said he had to pay his phone bill, so GREER said he would be right there after stopping at the CVS.

26. <u>In activation #11037, on March 25, 2014, at 1:23 p.m.</u>, JACKSON called GREER and they made arrangements to meet at 2:00 p.m. at the room on Old Central.

27. <u>From the oral bug, in Greer's vehicle, Session #364, on March 25, 2014 around 1:08 p.m.</u>, BORGES said, "200." GREER asked if that was it. BORGES said that was all for right now. GREER said the stuff would be gone in 20 minutes. GREER then said that it would not satisfy his people, and that he had seven or eight people now. BORGES explained this was

just to get started, "I'm just running around trying to get everybody."   GREER then explained that one [n-word] is getting 100, one [n-word] is getting 50, the other [n-word] he had not gotten in touch with yet.   BORGES said he would meet back up with GREEER in the morning. In this conversation, agents believe BORGES supplied GREER with 200 grams of heroin.

28.   <u>Activation #11115, on March 26, 2014, at 10:30 a.m.</u> GREER called BORGES at xxx-xxx-xxxx but he did not reach Borges nor did he leave a message.

29.   <u>From the oral bug, in Session #375, on March 26, 2014 at 10:37 p.m.</u>, GREER said, "I had my [n-word] that called me this morning, about an hour ago, all cash man. All cash, he wants 100. That's my 100 man." BORGES replied, "It's gonna be as soon as I leave out of here. I ain't even gonna take a shower. I'm gonna catch up with you."   Law enforcement officers knew Borges had been at his regular gym, No Excuses work out gym and believe this conversation occurred after Greer drove to the gym and while Greer and Borges were parked in his vehicle in the parking lot of the gym in Prince George's County.   Law enforcement quickly responded to the No Excuses gym and then followed Borges in his Toyota Corolla, from the gym to 4105 Southern Ave., Capitol Heights, Md., where he spend less than one hour before heading to meet Greer at the Wendy's Restaurant where the two men had been surveilled meeting before.

30.   <u>In activation #11145, on March 26, 2014, at 1:42 p.m.,</u> GREER called COREY RICH at telephone number xxx-xxx-xxxx and asked if RICH had any dumping abilities that day. RICH said he did not know.   GREER asked what he wanted to do, and said he was getting ready to go to the pool room in five minutes.   RICH said he would come by and say hi.   GREER told him not to come in, and to call GREER when he got out front.

31.   Then, at 1:58 p.m., in the parking lot of the Wendy's Restaurant near Branch Avenue and Old Silver Hill Road, in Prince George's County, law enforcement watched Charles

Greer and Joseph Borges meet inside Greer's vehicle, a 300 Chrysler, and learned that Borges provided Greer with about 300 grams of heroin. From Session #376, on March 26, 2014 starting at 1:57 p.m., GREER said, "How many is this?" and BORGES replied "300." GREER replied, "Okay, it is going to be gone today." As a result, law enforcement (using Prince George's County police officers) attempted to execute a traffic stop, but Greer rammed his car into the PGPD cruiser and drove off with police in hot pursuit, along Branch Avenue heading towards Washington, D.C. Activation #11153 at 2:00 p.m. BORGES called GREER and GREER yelled, "They on my ass man. They are on my motherfucking ass. I am running. I am running man."

32.     Although Greer initially fled from PGPD officers, Greer was eventually stopped and arrested within a few miles. On the median strip on Branch Avenue, along Greer's path of flight, FBI agents found and recovered a plastic bag containing about 300 grams of heroin (which Greer had discarded from the driver's side window).

33.     Meanwhile, around 3:45 p.m., Borges was arrested as he was in the process of arriving at his home in Accokeek, Maryland. Thereafter, a search warrant authorized by Magistrate Judge Schulze on March 25, 2014 (Misc. No. 14-721 JKS) was executed at Borges' residence on Horse Collar Rd. in Accokeek, Maryland. Law enforcement seized from Borges' master bedroom closet money in the amount of approximately $780,000 (a pack back with $649,800 and a shoe box with $130,800) and also $5,978 from his back pack which he had carried with him. Also found in Borges' home were two loaded firearms, a Smith & Wesson .357 Magnum Revolver and a .40 Glock (with an additional extended clip), a money counter, two Rolex watches and one Audemars Piguet watch and other expensive jewelry, among other items. (A recent appraisal revealed that the jewelry had a wholesale value of approximately $159,000.) Also seized were Borges' and his wife's U.S. Passports -- they reveal Borges and his

wife traveled to Tahiti (July 2013) and St. Barthelemy (French West Indies, July 2012). Borges' passport shows additional international trips in 2011 when he went through passport control at the airports in Amsterdam, Netherlands and Paris, France.

34.    Meanwhile, Corey RICH called GREER three times, at 3:58 p.m., 3:59 p.m., and 4:06 p.m., but did not leave a message.

35.    Thereafter, a search warrant, authorized by Magistrate Judge Schulze on March 25, 2014 (Misc. No. 14-720 JKS), was executed at Greer's residence on Owens Rd. in Oxon Hill, Maryland, and $13,000 was seized, along with two scales.

36.    The next day, on March 27, 2014, at 3:45 p.m., in 14-753 JKS, Magistrate Judge Schulze authorized (telephonically) a search warrant for "South Hill Apartment Homes xxxx Xxxxxxxx Xxx Apt XX Xxxxxxx Xxxxxx, MD." This is the location where task force officers saw Borges go to retrieve the 300 grams of heroin which he provided to Greer on March 26, 2014. Task Force members then executed the search warrant, making entry at 4:30 p.m. After they had arrived and begun the execution of the warrant, the agents realized that the address was actually "xxxx Xxxxxxx Xxxxxxx." (In fact, there is no xxxx Xxxxxxxx Xxxxxxx). Inside Apartment 2B, law enforcement found and seized five bricks containing over one kilogram of heroin, a heroin press (which weighed 100 pounds), acetone and spray bottles used with the press, four commercial blenders, 11 bars of manitol (a cutting agent), sifters, strainers, bags, bowls and cardboard boxes used to mix heroin, scales, and numerous items used to repackage heroin. Heroin powder covered these items and covered the countertops. The apartment was determined to be what is commonly called a stash apartment—that is, a location used to store and package narcotics but not easily connected to the person who is actually using the location for this illicit purpose.

37.    Also, on March 27, 2014, a seizure warrant was executed on a safe deposit box under Greer's control at a bank in Oxon Hill, Maryland (following authorization by Magistrate Judge Schulze on March 25, 2014, in Misc. No. 14-719 JKS) and $22,030 was seized.

38.    Also on March 27, 2014, a search warrant was executed at Jackson's residence at xxx Xxxxx Xx., X.X., Washington, D.C. (authorized by Magistrate Judge Deborah Robinson in 14-MJ-298) and the FBI seized $10,450 in cash.  Jackson was also arrested.

39.    On April 15, 2014, RICH was arrested and his residence searched.

40.    Your affiant and other law enforcement officers identified Corey RICH in the following manner: once incriminating phone calls were intercepted involving the xxx-xxx-xxxx telephone, subscriber information was obtained.  RICH was listed as the subscriber.  Thereafter, on or about November 5, 2013, when reviewing the pole camera from October 30, 31 and November 2, 2013, agents watched when the user of the xxx-xxx-xxxx telephone arrived at the car lot to meet Greer in a green Toyota Camry with DC tag EJ 6645.  Agents then learned that the car was registered to Corey RICH, with a listed address of 150 Xenia St. S.E. Apt. 102, Washington, D.C.  (150 Xenia St., S.E. is address is actually a condemned, abandoned building with a chain link fence around it, blocking access.)  Thereafter, law enforcement officers compared a government issued photograph of Corey RICH and visually confirmed that the person who met with Greer on those dates was in fact the Corey RICH in the photograph. Moreover, a photo of Corey RICH was shown to another FBI agent who was involved in investigating RICH in the case resulting in a prior conviction[1] and the agent further confirmed that the photo of RICH is the same Corey RICH who was previously convicted for his

---

[1] In 2001, RICH was convicted in federal District Court for the District of Columbia in Cr. No. 99-322(GK) for participating in a conspiracy that involved more than one kilogram of heroin. He received a sentence of 12 years and was only released in October 2012.

involvement in a heroin conspiracy.   I declare under penalty of perjury that the foregoing is true

and correct to the best of my knowledge and belief.

_____
SPECIAL AGENT JAMES HARTMAN
MPD/FBI Safe Streets/ Cross Border Task Force

SWORN AND SUBSCRIBED BEFORE ME ON THE \_\_\_\_\_ DAY OF APRIL, 2014.

_____
UNITED STATES MAGISTRATE JUDGE